UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

ELAINE ROUGEAU

VERSUS

LOUISIANA DEPARTMENT OF
SOCIAL SERVICES

CIVIL ACTION

NO. 04-432-JJB-DLD

**RULING ON PARTIAL MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on a Motion for Summary Judgment filed by the defendant, the Louisiana Department of Social Services ("DSS") (doc. 73). The plaintiff, Elaine Rougeau, has filed a Memorandum in Opposition to the defendant's Motion for Summary Judgment (doc. 78). The defendant has filed a reply (doc. 82).

This is the second Motion for Summary Judgment filed by the defendant. Since the plaintiff's amended complaint included allegations not addressed in the defendant's first motion, the Court treated the first motion as a Partial Motion for Summary Judgment and, in its ruling (doc. 61), addressed only the plaintiff's claims of race and color discrimination based upon a failure to promote and the plaintiff's retaliation claim. The Court, in its previous ruling, denied summary judgment on the discrimination claims, but granted summary judgment on claims of retaliation based on a failure to promote because plaintiff had not established a *prima facie* case. The defendant has now moved for summary judgment as to all of the claims that have not already been considered.

**Factual Background**

The plaintiff, Elaine Rougeau is a female of bi-racial heritage.[1] She was employed by the Louisiana Department of Social Services as an Information Technology Liaison Officer from May 2002 through February 2006. She worked in IT's Consumer Relationship Management (CRM).

The plaintiff filed suit against her employer alleging racial discrimination, gender discrimination, and retaliation in violation of state and federal law. The events giving rise to the plaintiff's cause of action began in February 2003. The plaintiff alleges that in February 2003 she and co-worker, Frances Hargus, a Caucasian female, met with their supervisor, Mark Hodges, a Caucasian male, for the purpose of receiving annual performance evaluations. The plaintiff contends that both she and Ms. Hargus were dissatisfied with the results of the evaluation. Consequently, Mr. Hodges changed Ms. Hargus' performance results. The plaintiff alleges that Mr. Hodges stated that he would also correct the plaintiff's evaluation; however, these changes were not made to the plaintiff's evaluation before the evaluation was reviewed by human resources and the promotion committee.

Frances Hargus was offered the promotion to Information Technology Liaison Office Manager. The plaintiff alleges that this employment decision was based upon the defendant's discriminatory motives. The defendant contends that the decision

---

[1] Though plaintiff is of bi-racial descent, she looked caucasian to her co-workers. *See e.g.,* Affidavit of Mark Hodges. Doc 73-21, p. 3, ¶ 13.

was based upon scores given by a committee panel composed of three persons that interviewed twelve applicants. Defendant maintains that Ms. Hargus was offered the promotion because she obtained a higher score than the plaintiff.

The plaintiff further alleges that the following series of events took place: (1) plaintiff sought a lateral transfer in May 2003 and was denied; (2) in July 2002 the plaintiff filed a complaint with the DSS Bureau of Civil Rights; (3) on August 21, 2003 the plaintiff was denied educational leave despite prior approval by her supervisor; (4) plaintiff was never designated project manager although she possessed a higher educational degree and had veteran status over co-workers who had been appointed project manager; (5) plaintiff filed a second grievance with DSS in February 2004; and 6) plaintiff filed a third grievance on June 17, 2004.[2]

On September 1, 2003 the plaintiff filed a complaint with the Equal Employment Opportunity Commission (EEOC). In the complaint, the plaintiff claimed that she had received a "less than favorable performance evaluation" and that her previously approved educational leave had been denied without explanation. The plaintiff stated that her evaluation was handled in that manner because of her "mixed racial descent" and that her educational leave was rescinded

---

[2] At the time plaintiff filed her first grievance, the "chain of command" in plaintiff's department (the Information Technology Department) was as follows:
(A) Director of IT, Duane Fontenot;
(B) Deputy Directors of IT, Don Andries, Dickie Howze, Dr. Barbara Hunter;
(C) IT Liaison Office Manager, Frances Hargus;
(D) IT Supervisor, Gaynell Boooker;
(E) IT Liaison Officer 4, Elaine Rougeau.

"in retaliation for my making a complaint of racial harassment in my workplace." The plaintiff's right to sue letter was mailed on March 29, 2004. This instant suit was filed on June 25, 2004.

On September 3, 2004, the plaintiff filed a second EEOC charge. In this charge, the plaintiff stated that she continued to experience retaliation and disparate treatment including, but not limited to "job assignments, disparities-denied assignments, hostile work environment, negative work performance evaluation, harassment, and creating promotional obstacles." The plaintiff concluded that she had been discriminated against based on her "color, light skin and in retaliation for filing a previous EEOC Charge."

The EEOC concluded that more than 180 days had passed since the filing of the charge and issued a Right to Sue Notice on February 15, 2005. The Court considered the above facts in its previous ruling.

On March 3, 2005, the plaintiff amended her complaint and added claims of color discrimination and claims of additional retaliation. In the amended complaint, plaintiff lists limited job assignments, hostile work environment, negative performance evaluations, harassment and promotional obstacles as evidence of retaliation.

In short, plaintiff's petition alleges that (1) Mark Hodges was racially discriminatory in completing his 2003 evaluations (Doc. 1 ¶¶ 4-10); (2) Terri Eckles was racially discriminatory for allegedly sending negative e-mails to Hodges about

plaintiff. (Doc. 1,    ¶ 10); (3) Frances Hargus' (and perhaps Don Andries') denial of educational leave was in retaliation for filing an internal complaint (Doc. 1 ¶¶ 17-19); (4) plaintiff was denied status as a project manager in retaliation for filing complaints (Doc. 1, ¶¶ 20-21); and (5) racial discrimination and/or retaliation by Gaynell Booker in filling out plaintiff's 2004 evaluation.

## Standard of Law

Summary judgment is appropriate when the pleadings, answers to interrogatories, admissions, and affidavits on file indicate that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

When the burden at trial rests on the non-movant, as it does here, the movant need only demonstrate that the record lacks sufficient evidentiary support for the non-movant's case. *Id.* The movant may do this by showing that the evidence is insufficient to prove the existence of one or more elements essential to the non-movant's case. *Id.*

Although this court considers the evidence in the light most favorable to the non-movant, the non-movant may not merely rest on allegations set forth in the pleadings. Instead, the non-movant must show that there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). Conclusory allegations and unsubstantiated assertions will not satisfy the non-movant's burden. *Grimes v. Dep't of Mental Health*, 102 F.3d 137, 139-40 (5th Cir. 1996). If once the

non-movant has been given the opportunity to raise a genuine factual issue, no reasonable juror could find for the non-movant, summary judgment will be granted. *See Celotex*, 477 U.S. at 322; *see also* Fed. Rule Civ. P. 56(c).

## Analysis

The defendant argues that summary judgment is appropriate based on the plaintiff's complaint, the defendant's Statement of Undisputed Material Facts, the Affidavits of Don Andries, Mark Hodges and Terri Eckles and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e-2000e-17.  The defendant argues that there is no genuine issue of material fact necessitating a trial because the plaintiff has failed to establish the existence of retaliation, disparate treatment, hostile work environment, or racial discrimination.

The court considers all of plaintiff's claims in turn.

**I.      Retaliation**

Defendant argues that plaintiff cannot establish a *prima facia* case of retaliation. Under 42 U.S.C. § 2000e-3(a), an employer may not "discriminate against any of his employees... because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  "To establish a *prima facia* case for retaliation, an employee must show: (1) that she engaged in a protected activity; (2) that an adverse employment action occurred; and, (3) that a causal link existed between the protected activity and the adverse action." *Baker v. American Airlines, Inc.*, 430

6

F.3d 750, 754-55 (5th Cir. 2005); *Hernandez v. Crawford Bldg. Materials Co.,* 321 F.3d 528, 531 (5th Cir. 2003).  Once the plaintiff establishes a prima facie case of retaliation, the burden shifts to the employer to "state a legitimate non-retaliatory reason for its action."  *Baker*, 430 F.3d 750, 754-55.  If the employer states a legitimate, non-retaliatory reason, "any presumption of retaliation drops from the case" and the burden shifts back to the employee to show that the stated reason is actually a pretext for retaliation'."  *Id.* at 755.

Plaintiff alleges DSS took adverse actions against her in retaliation for filing various grievances.[3] Plaintiff alleges that the adverse actions include (a) the denial of educational leave to pursue a Ph.D. and (b) the failure to designate her as a "project manager."

The grievances are protected activities under Title VII.  They satisfy the first element necessary for the *prima facie* case.  The defendant contends, however, that plaintiff's retaliation claims fail because she cannot meet the second element of the case.

**A) Retaliation - Educational Leave**

Plaintiff claims that Frances Hargus denied plaintiff's request for educational leave in retaliation for naming Ms. Hargus in an internal complaint.  The defendant

---

[3] See "Factual Background," *supra*. The grievances filed by plaintiff include three internal complaints with DSS Bureau of Civil Rights (July 9, 2003 with an addendum filed on July 23, 2003, February 24, 2004, and June 17, 2004); two EEOC complaints (September 1, 2003 and September 3, 2004); and a lawsuit against DSS filed on June 25, 2004.

argues that the denial of educational leave was not an adverse action; that educational leave is not a right, but a privilege. The difference between educational leave and annual leave is that educational leave is paid in time leave. The use of it does not accumulate in the same way as annual leave, which is earned.

The Court finds that the denial of educational leave was an adverse action. In *Burlington Northern & Santa Fe Railway Co. v. White,* ___U.S.___, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006), the Supreme Court distinguished the substantive provision in Title VII which "seeks to prevent injury to individuals based on who they are, *i.e.,* their status" with the anti-retaliation provision which "seeks to prevent harm to individuals based on what they do, *i.e.*, their conduct." *Id.* at 2412. The Supreme Court concluded that the scope of the anti-retaliation provision extends beyond the workplace to protect "an individual not from all retaliation, but from retaliation that produces an injury or harm." It deemed that an adverse employment action in a retaliation claim is any action that "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 2415.

Additionally, the Supreme Court stated, "[w]e refer to reactions of a *reasonable* employee because we believe that the provision's standard for judging harm must be objective. An objective standard is judicially administrable. It avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings." *Id.*

Here, even though educational leave is not a right guaranteed by plaintiff's

employment, the Court finds the plaintiff was adversely affected when she was forced to withdraw from the Ph.D. program when she reached the maximum amount of annual leave allowed. Yet, while the Court finds that plaintiff suffered an adverse action, it does not find that there is a genuine issue over whether there is a causal connection between the protected activity and the adverse action.

The Court finds that on Wednesday, July 23, 2003, the LSU Ph.D. program sent plaintiff a letter requesting a reply by Friday, August 1, 2003 to an offer of admission. On Wednesday, July 30, 2003, a mere two days before plaintiff had to inform the LSU Ph.D. program, plaintiff sent a letter to Don Andries requesting "Part-Time Educational Leave or a Flexible Work Schedule." (Doc. 73-11, Exh. 7-A). Pursuant to Andries' request, Ms. Hargus obtained pertinent information from plaintiff regarding the nature of the course work, and how the course work would enhance her job performance. (Doc. 73-12, Exh.7-B) On August 1, 2003, Gaynell Booker notified Don Andries and Dickie Howze that neither she nor Frances Hargus objected to plaintiff's request for educational leave assuming the leave would not affect plaintiff's work. Hargus went on vacation from August 4, 2003 through August 15, 2003. In the course of considering plaintiff's leave request, Andries determined that educational leave would not be an option due to the massive workload of the IT Division. This is clearly evidenced by an August 11, 2003 e-mail Don Andries sent to Booker and Hargus. (Doc. 73-13, Exh. 7-C).

The Court finds that while Don Andries sought the opinions of Hargus and

Booker, the decision regarding plaintiff's leave request was squarely in Andries' hands. As evidenced by the August 11, 2003 e-mail, Andries had concerns about the workload in the IT department. The alleged retaliation in this case is that Hargus learned that she was named in plaintiff's complaint for discrimination before plaintiff's educational leave request was denied. The Court finds that there is no genuine issue as to whether Hargus made any decisions, had any authority to make decisions, or could retaliate against plaintiff by denying her educational leave. Andries made his conclusion about plaintiff's leave while Hargus was on vacation. The record indicates that Hargus— before she left for vacation— indicated to Andries no objection to plaintiff's request.

The Court finds that although plaintiff was not notified until August 21, 2003, the Andries' e-mail from August 11, 2003 clearly indicates that educational leave was not an option. In light of the plaintiff's allegation directed at Hargus, the Court finds no evidence tending towards a material issue that Hargus retaliated against plaintiff after she learned she was named in plaintiff's complaint. The Court finds that Andries' conclusions regarding education leave preceded Hargus' knowledge that she was named in a complaint. Thus, the court sees insufficient evidence to withstand a finding that there is a genuine issue over whether the denial of educational leave was in retaliation for being named in a complaint.

**B) Retaliation - Project Manager Position**

Plaintiff alleges that after she filed the various grievances, she was retaliated

against when she was denied status as a project manager (sometimes hereinafter referred to as "PM").  A project manager "is appointed by the IT Deputy Directors based on an individual employee's expertise." (Doc. 73-10).  Within the DSS IT department, a "project manager is someone who manages a particular project which typically requires multiple persons acting as a team." Additionally, "designation as a project manager in the IT division is not recognized in the civil service job descriptions for IT positions" and project managers and vice-project managers receive no additional pay for the designation.  *Id.*

Outside of the DSS IT department, the term "project manager" apparently carries with it much more significance. Plaintiff argues that "the PM designation is crucial for any individual who wishes to obtain accreditation" from the Project Manager Institute.[4]  The Court finds the merits of this argument inapplicable to the case at bar.  The defendant had no obligation to train plaintiff for a position outside of her job description, or for an accreditation that has no bearing on plaintiff's employment with DSS.

Additionally, the Court finds that since the plaintiff *did* gain project manager status, she *did not* suffer an adverse action.  The plaintiff alleges that the DSS Project Profile Document Status (Doc. 73-19) is false, misleading and contradictory.  Other than alleging that it contradicts an April 5, 2004 memo (Doc. 78-6) from Duane Fontenot and Don Andries to DSS Civil Rights Director Paula Braxton, the

---

[4] The "Project Manager Institute" (PMI) regulates project manager accreditation.

11

plaintiff does not set out how the document— or the information in the document— is false. The defendant, on the other hand, establishes why the document is informative. While the April 5, 2004 memo indicates that plaintiff was not a project manager, additional summary judgment evidence informs the Court that plaintiff's name appears as a project manager on the Project Profile Document, but not on the April 5, 2004 memo, because she was not a project manager until May-June 2004, a month after the April 5, 2004 memo.

Regardless of what the memo does or does not indicate, the Court finds that the plaintiff was a project manager on the Bureau of Licensing Automated System (BLAS) Maintenance and a vice project manager on the "PARIS" assignment. The plaintiff has not shown that she suffered an adverse action rising to the level of discriminatory retaliation. Based on the evidence put forward by the defendant, and the lack of evidence put forward by the plaintiff, the Court finds that (a) a civil service IT Liaison Officer 4 is generally not responsible for project management, (b) status as a project manager carried very little weight within the IT department, (c) plaintiff suffered no adverse action, and (d) the defendant did not retaliate against the plaintiff by denying her the status of project manager.

**II.    Disparate Treatment**

As both parties are aware, the Court has already ruled on this part of the plaintiff's case. (Doc. 61). In its prior ruling, the Court granted the defendant's motion on plaintiff's claim for retaliation based on failure to promote. The Court

notes that the plaintiff's claims concerning educational leave and project manager designation are for retaliation rather than discrimination.

### III. Hostile Work Environment

Plaintiff alleges that defendant subjected her to a hostile work environment. The Supreme Court has held that Title VII is violated when the workplace is permeated with discriminatory behavior that is sufficiently severe or pervasive to create a discriminatorily hostile or abusive working environment. *Harris v. Forklift Systems, Inc.* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). To prevail on a hostile work environment claim, plaintiffs "must prove that: 1) they belong to a protected group; 2) they were subjected to unwelcome harassment; 3) the harassment complained of was based on race; and 4) the harassment affected a term, condition, or privilege of employment." *Frank v. Xerox Corp.*, 347 F.3d 130, 138 (5th Cir. 2003). The plaintiff must subjectively perceive the harassment as sufficiently severe or pervasive, and this subjective perception must be objectively reasonable. *Harris*, 510 U.S. at 17; 114 S.Ct. at 368. In determining whether conduct creates a hostile work environment, the court must consider the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, and whether it unreasonably interfered with plaintiff's work performance. *Id.*

There is no doubt that plaintiff, who is of bi-racial decent, is a member of a protected class. Plaintiff claims that a hostile work environment was created by

certain allegedly-made racially charged statements. The Court finds that plaintiff's claim of a hostile work environment is not supported by any evidence other than her own subjective view of certain events. Plaintiff has come forward with no witnesses, or other evidence to indicate that she was subjected to a hostile work environment. While plaintiff contends that she endured racially charged "questioning and commentary from DSS employees at all levels and on a constant basis," the Court does not find evidence to support a genuine issue of fact for trial over whether she fell victim to a hostile work environment.[5]

## VI.   Racial Discrimination

Plaintiff identifies Mark Hodges, Terri Eckles, and Gaynell Booker as people in her department who engaged in racial harassment and/or discrimination against her creating a hostile work environment. The Court considers the allegations

---

[5] In its examination of the record, the Court was particularly jarred by a list of 52 questions/statements which the plaintiff alleges she encountered during her tenure at DSS. (Doc. 78-7). The Court is sympathetic to anyone subjected to the nature of the harassment alleged in that list of questions. Not only do the alleged questions and comments qualify as racial harassment, they also probably qualify as sexual harassment. Comments and questions of that nature have no place in the workplace, and the Court in no way condones such harassment. However, in carefully examining all of the summary judgment evidence, it is difficult for the Court to find that defendant singled-out, retaliated-against, discriminated-against the plaintiff, or subjected the plaintiff to a hostile work environment on account of her racial heritage. While those comments are highly offensive and inappropriate, the plaintiff has done nothing more than merely allege that they were asked of her. In her opposition, plaintiff has not provided very much direction to the Court to discount the affidavits and other evidence supplied by the defendant.

To be sure, the body of evidence indicates a great deal of frustration with plaintiff's ability to adequately perform her job tasks. However, it does not indicate that such frustration stemmed from systematic discrimination and a conspiracy of racism within the department.

against the above-named individuals in turn.

**A.    Mark Hodges**

In the spring of 2003, Mark Hodges was the IT Liaison Office Manager at DSS. He was plaintiff's immediate supervisor. As her supervisor, he was responsible for completing plaintiff's Performance Planning and Review Form ("PPR"). He was also responsible for completing the PPR for Frances Hargus. During the events in question, plaintiff and Hargus were co-workers. According to the defendant, Hodges initially gave both plaintiff and Hargus (a caucasian female) poor reviews. Both women disagreed with their respective ratings. He first changed Hargus' review and later changed plaintiff's review.

According to his affidavit, Hodges changed Hargus' rating before he changed plaintiff's rating because "the problem areas in [plaintiff's] evaluation could not be overlooked and the areas where she fell short were key and critical to the effective operation of the IT department." (Doc. 73-21). Only after plaintiff accused Hodges discriminating against her on the basis of race did he upgrade plaintiff's evaluation. He did this to avoid further accusations from the plaintiff. *Id.*

The Court finds that because Hodges was unaware that plaintiff was "inter-racial" when he evaluated her, he could not have discriminated against her on the basis of race. The plaintiff does nothing to address Hodges' lack of knowledge about the composition of plaintiff's heritage, and thus, there is no genuine issue as to whether Hodges racially discriminated against plaintiff if he was unaware of

plaintiff's inter-racial heritage.

**B.     Terri Eckles**

Terri Eckles was plaintiff's co-worker at all relevant periods in question.  She is also a Caucasian female.  Plaintiff alleges in her petition that Mr. Hodges used e-mails from Ms. Eckles to complete the low evaluation.  (Doc. 1, p. 10).  Plaintiff claims that Ms. Eckles "poisoned the minds" of plaintiff's supervisors.  It is clear to the Court that Ms. Eckles' success in her job performance was contingent on plaintiff performing her own job adequately and responsibly. Based on the summary judgment evidence submitted to the Court, the Court has no doubt that Ms. Eckles' own job performance suffered when plaintiff's job performance was inadequate.

According to Ms. Eckles' affidavit in which she verifies a September 3, 2003 memorandum (doc. 73-22, p.3)  she wrote in response to plaintiff's allegations of racial discrimination, plaintiff's perception of racial discrimination was misplaced. Based on the September 3, 2003 memo, along with the supporting documentation, it is clear that Ms. Eckles frustration did not stem from any racial prejudices directed towards plaintiff, but rather from plaintiff's on-going needs of assistance and supervision based on plaintiff's "[un]clear understanding of her job duties." *Id.*

In light of the evidence, the Court finds that plaintiff's continued requests for assistance and  failure to keep Ms. Eckles informed about information which was needed for her [Eckles] to fulfill her job tasks caused the frustration, not the plaintiff's racial composition.  The Court also finds that while Eckels indeed informed the new

CRM supervisor about the complaints which she previously submitted to Mark Hodges, she did so in order to keep the new CRM supervisor— who had responsibility for the department and plaintiff— informed of the situation in the department, rather than to slander the plaintiff.

The plaintiff does not address the claims against Ms. Eckles in her opposition to defendant's motion, and other than plaintiff's July 9, 2003 complaint which alleges Ms. Eckles "deep-rooted racist tendency," there is no evidence offered that anything Ms. Eckles did or said was racially discriminatory. The Court finds that there is no genuine issue of fact over allegations of racially motivated discrimination by Ms. Eckles towards plaintiff because the plaintiff does not make any effort to substantiate such allegations.

**C.   Gaynell Booker**

Gaynell Booker was plaintiff's immediate supervisor during the relevant period and was responsible for completing plaintiff's March, 2004 performance evaluation. (Doc. 1, ¶ 23). She is an African-American female. The defendant claims that there is no authority to support a finding of African-American/African-American racial discrimination. However, the likely basis for plaintiff's discrimination claim against Ms. Booker is not racial discrimination, but rather color discrimination, which is recognized, albeit rarely, under Title VII. *Walker v. IRS*, 713 F.Supp. 403 (N.D. Ga. 1989).

Based on the memoranda, the summary judgment evidence and the

pleadings, the Court does not find that plaintiff has made out a case of color discrimination against Ms. Booker. While the defendant is incorrect in asserting that African-American on African-American discrimination cannot exist, the plaintiff merely voices frustration with how Ms. Booker evaluated her in Performance and Planning Review (PPR). The Court cannot find any indication that Ms. Booker exhibited any discrimination against the plaintiff on account of her skin color, or her bi-racial heritage.

## CONCLUSION

Accordingly, the defendant's motion for summary judgment (doc. 73) on claims of retaliation for educational leave, retaliation for the project manager position, a hostile work environment, and racial discrimination as to Terri Eckles and Mark Hodges and Gaynell Booker is hereby GRANTED.

The defendant's motion for summary judgment on a disparate treatment claim has already been considered by the court and remains unchanged (doc. 61).

Baton Rouge, Louisiana, March 25, 2008.

JAMES J. BRADY, JUDGE
MIDDLE DISTRICT OF LOUISIANA